**JACK NEILSON, INC., Petitioner-Appellant,**

v.

**TUG PEGGY et al., TUG MARGARET et al., TUG CARMEN et al., Respondents-Appellees.**

**No. 27823.**

United States Court of Appeals, Fifth Circuit.

May 5, 1970.

On Rehearing June 30, 1970.

Rehearing Denied and Rehearing En Banc Denied Sept. 22, 1970.

George O'Dowd, New Orleans, La., for appellant.

William L. Von Hoene, New Orleans, La., for appellees.

Before TUTTLE, WISDOM, and GOLDBERG, Circuit Judges.

**PER CURIAM:**

Apache Towing, Inc., contracted with Jack Neilson, Inc., to "lease" three vessels from Neilson for sixty months. Apache agreed to "buy" the vessels for a stipulated price at the end of this period. When Apache defaulted during the sixty months and returned the vessels, Neilson, sued in admiralty for damages. Apache moved to dismiss on the ground that the contract was one of purchase, not a charter hire, and that the district court therefore had no admiralty jurisdiction. The Ada, 2 Cir. 1918, 250 F. 194; Grand Banks Fishing Co. v. Styron, S.D.Me. 1953, 114 F.Supp. 1.

Neilson then amended its complaint to eliminate a claim for the purchase price and limited its request to damages under the "lease". The district court denied the motion to dismiss, finding that the "lease" provisions of the contract were severable from the "purchase" provisions and that Neilson could therefore sue in admiralty on the former. The district court allowed an interlocutory appeal on this order, however, under 28 U.S.C. § 1292(b). Twelve days later Apache filed in this court its application to appeal, and this Court granted it.

■ We conclude that we have no jurisdiction of this interlocutory appeal. Fed.R.App.P. Rule 5(a) provides a ten-day period in which to file a petition for permission to appeal under § 1292(b). This Rule, as one of the Appellate Rules, supersedes 28 U.S.C. § 2107's provision of fifteen days for interlocutory appeals in admiralty. 28 U.S.C. § 2072; see Hansen v. Trawler Snoopy, 1 Cir. 1967, 384 F.2d 131. And Rule 26(b) prohibits our enlarging the time for a petition for permission to appeal.

Nor do we find jurisdiction under 28 U.S.C. § 1292(a). Part (3) of that subsection allows an appeal only from those interlocutory decrees in admiralty that "determin[e] the rights and liabilities of the parties". The dis-

trict court's denial of the motion to dismiss for lack of jurisdiction did not decide the parties' rights and liabilities within the meaning of the statute. It did not go to the merits of the claim. See Miskiewicz v. Goodman, 4 Cir. 1965, 341 F.2d 828, 830–831; Upper Mississippi Towing Corp. v. West, 8 Cir. 1964, 338 F.2d 823, 825.

We therefore dismiss the appeal.

**ON PETITION FOR REHEARING**

**WISDOM, Circuit Judge:**

The Court on May 5, 1970, dismissed this interlocutory appeal under Fed.R. App.P. Rule 5(a). The petition for permission to appeal appeared to have been filed two days after the expiration of the ten-day period allowed for filing such petitions. The Court has now learned that the tenth day fell on Sunday, March 31, 1969, and that appellant's counsel timely filed his petition with the Clerk of Court shortly before the close of business on Monday, April 1, 1969, but a newly employed clerk mistakenly waited until April 2, 1969, to mark the petition "Filed". Accordingly, we grant the petition for a rehearing, vacate our order of May 5, 1970, and allow the appeal from the interlocutory order.

\* \* \*

■ The owner of three vessels seeks to recover unpaid monthly rentals for the lease of the vessels under a lease-purchase agreement cast in the form of a bareboat charter. We hold that the charter provisions of the contract are maritime in nature, are severable, and within the admiralty jurisdiction of the district court.

In April 1965 Apache Towing, Inc., entered into three contracts with Jack Neilson, Inc., covering the lease for sixty months and purchase of three tugboats. The contracts are entitled "Bareboat Charter Party and Option". The terms of the three contracts are virtually identical, except that the monthly rental ($800, $667, and $533 for the Peggy, the Carmen, and the Margaret respectively) and the stipulated purchase price ($60,-000, $50,000, and $40,000 respectively)

are different for each vessel. The terms and the conditions are characteristic of a typical bareboat charter. Each contract, however, contains an option to purchase the vessel during the charter period, "with credit against above purchase price and 'add-on' interest thereon accruing at six percent per annum for all charter hire previously paid." The contract also provides: "At the termination of the sixty month period, The Charterer agrees to purchase the vessel and the Owner agrees to sell said Vessel to the Charterer for cash" $30,000, $25,000, $20,000 for the Peggy, the Carmen, and the Margaret respectively. Except as to the stipulated amount, each contract provides that:

> If charterer fails to pay any charter hire or other amount herein provided after the same is due and payable, or if Charterer fails to observe, keep or perform any other provisions of this charter party required to be observed, kept or performed by Charterer, then upon written notice of said default Charterer is to have (30) thirty days from receipt of said notice to purchase said Vessel for *$50,000.00* plus six (6%) per cent interest per annum accrued thereon up to the time of the purchase. The full charter hire previously paid as of the date of the written notice shall be applied toward the purchase price and accumulated interest."

As early as December 1966, Apache was three months in arrears on the charter hire: The charterer then voluntarily returned the ships to their owner.

In May 1966 Neilson, as owner of the Tug "Peggy", brought a libel and complaint against Apache and others [1] for breach of contract, civil and maritime". Neilson sued for the full amount of the purchase price of $60,000 less $4000, the amount previously paid by Apache. In addition, Neilson asked for $7500 for the cost of repairs made necessary by damage to the Tug Peggy during Apache's operation of the vessel. Neilson

brought similar actions to recover the purchase price of $50,000 for the Carmen and $40,000 for the Margaret. In these actions too the complainant asked for costs of repairs to the vessels. The cases were consolidated in the district court.

The defendants answered, asserting, among other defenses, that the "libellant failed to provide a seaworthy vessel at the inception of the charter". Shortly thereafter, the defendants filed an exception to the jurisdiction on the ground that the subject matter of the dispute was a non-maritime ship-purchase agreement. The district court upheld the exception but granted the plaintiff leave to file a supplemental amended complaint.

The amended complaint bears little resemblance to the original complaint. It rests entirely on those terms of the parties' agreements which relate to chartering the vessels. Neilson now avers that the contract was a bareboat charter party; that Apache failed to pay the monthly charter hire; that Neilson is entitled to sixty months of rentals on each of the three vessels, less a deduction for the amounts the charterer previously paid as charter hire. The total claim now asserted for the charter payments is $119,920 as against the original claim of $150,000 for the purchase price subject to a deduction for the charter rentals paid.

Benedict broadly states the generally accepted rule governing the extent of admiralty jurisdiction over contracts.

> The celebrated and learned commentators upon the maritime codes and other writers of textbooks upon the maritime law, such as Selden, Grotius, Stracha, Bynkershoek, Valin, Stypmanus, Loccenius, Casa Regis, Emerigon, Kuricke, Pothier, Roccus, Malynes, Cleirac, Boucher, Boulay, Paty, Pardessus, Vennius, Lubeck, Targa and many others, whose works have been the universally known and everywhere conceded evidence of the admiralty and maritime law, have not adopted

---

1. Cimmeron Towing, Inc., Henry A. Billiot, d/b/a Marco Towing Co. and two guarantors, Edward L. Buras, Sr. and James J. Buras.

any narrow rule respecting the extent of the admiralty jurisdiction. The question, whether the cause of action arose within the limits of a country, or in a harbor, or was founded upon an instrument, sealed or unsealed, or made on shore or on shipboard, in a usual or unusual form, appears never to have entered the minds of those legislators and jurists. They have always looked solely to the maritime nature and character of the transactions, which cannot depend upon any such considerations, and they treat of all cases of service, contract, tort or accident relating to ships, shipping and maritime commerce. It is now settled law in the United States that the jurisdiction of admiralty in matters of contract depends upon the subject-matter, i. e., the nature and character of the contract, and that the English rule which conceded jurisdiction (with few exceptions) only to contracts made and to be performed upon navigable waters is inadmissible, the true criterion being that the contract has reference to maritime service or maritime transactions.

1 Benedict, The Law of American Admiralty, § 62, p. 127 (6th Ed. 1940).

Unfortunately, "when a high-level abstraction such as 'maritime' has to be used to draw a line between concrete cases", the "test of maritime subject-matter" is difficult to apply.[2] Not infrequently the test has resulted in anomalies. Suits or contracts for the building and sale of vessels "might be thought to be included, but actually are not" maritime in nature.[3] Yet ship mortgages are within admiralty jurisdiction.[4]

Here, no doubt the owner of the three tugs hoped that the charterer would exercise the option to purchase during the charter period. No doubt the owner felt comfortable about the charter's agreement to purchase at the expiration of the charter. But the subject of each contract was a vessel that might be afloat and in the control of the charterer for five years. The contract was drawn therefore with maritime problems in mind, particularly problems relating to bareboat charters. No one can possibly read the complicated contract sued on in this case and arrive at any other conclusion than that the dominant provisions relate to operation of a vessel by a charterer and an admiralty court, aided by procters, is the best qualified tribunal to undertake the task of construing the contracts.[5]

2. Gilmore and Black, The Law of Admiralty, p. 25 (1957).

3. *Id.* p. 26.

4. See Detroit Trust Co. v. The Thomas Barlum, 1934, 293 U.S. 21, 55 S.Ct. 31, 79 L.Ed. 176, sustaining the constitutionality of The Ship Mortgage Act, 41 Stat. 1000 (1920), 46 U.S.C. § 921 et seq. (1946). See also Morrison, The Constitutionality of the Ship Mortgage Act of 1920, 44 Yale L.J. 16 (1934).

5. The policy argument was well expressed by Judge Roszel L. Thomsen in Flota Maritima Browning v. The Ciudad De La Habana, D.C.Md.1960, 181 F.Supp. 301, 309:

> There are valid arguments in favor of the proposition that admiralty courts should take jurisdiction over claims arising out of contracts for the sale of a ship, though not for specific performance of contracts of sale, and even stronger arguments for taking jurisdiction over claims arising out of lease-purchase contracts. For example, admiralty courts are generally familiar with the subject matter of such contracts and with the related questions which frequently arise; admiralty procedure is usually more flexible and speedier than state court procedure in comparable cases; the admiralty rules with respect to attachment, release on stipulation, and the like, are uniform throughout the country and are well known to admiralty lawyers, whereas the attachment laws and practices of the several states are very different and are ill-adapted to cases involving vessels engaged in navigation, where seamen, cargo owners and others may have all sorts of conflicting claims and liens, which admiralty courts and the admiralty bar are accustomed to handle. ¶ The traditional subject matter test—whether the contract relates to the navigation, business or commerce

The defendants' argument against the court's taking jurisdiction comes from an undiscriminating application of the petrified rule that ship-sale contracts are not within admiralty jurisdiction. "This seemingly well-settled rule arose as an analogy to a case [6] which is inconsistent with basic principles governing the admiralty jurisdiction of United States courts. Even today the precedent for such a rule is scant." Note, Admiralty Jurisdiction and Ship-Sale Contracts, 6 Stan.L.Rev. 540 (1954).[7]

The first and most influential case for the proposition that ship-sale contracts are outside admiralty jurisdiction was The Ada, 2 Cir. 1918, 250 F. 194. In *The Ada* the charterer had an option to purchase for the sum specified in the charter party as the hire. The owner withdrew the vessel, and the charterer filed a libel in rem against the vessel and in personam against the owner to recover damages sustained by the charterer, both for breach of the charter and for breach of the contract of sale. The owner filed exceptions to the libel, arguing that the damages claimed arose from a breach of contract for the sale of the vessel, a cause of action not within the admiralty jurisdiction.

The charter was only for six months; the purchase-price was the same as the total charter payments; the so-called charterer had notified the owner that it would purchase the vessel and had tendered the purchase-price. The language of the opinion clearly shows the court's intention to limit the effect of the decision:

If this charter had provided for the use of the vessel for six months at a specified charter hire, and had given the charterer the option thereafter to purchase at a fixed price, there would be two separate causes of action; the former justiciable either in admiralty or at law, and the latter at law only. But the right to use and the right to buy the steamer in this case were inseparably connected. The price for the use for six months was the same as the price for the absolute ownership. Obviously no one would fail to exercise such an option. All the provisions of the agreement show that the main intention was a contract of sale.

The Ada, 2 Cir. 1918, 250 F. 194 at 195–196.

In Flota Maritima Browning v. The Ciudad De La Habana, D.C.Md.1960, 181 F.Supp. 301, the lease-purchase contracts provided for long term bareboat chartering (as in the case here under review)— fifteen years under one contract, seven years under the other with certain options to the lessee and to the owner. Chief Judge Thomsen held:

If the several contracts had run to nearly their full course, the lessee would undoubtedly have exercised its option to purchase, because the payments for rental or charter-hire would have nearly equalled the purchase price. But many events might have occurred in the early part of the term to cause the lessee to terminate the contract. ¶ *The contracts in the instant case are therefore different from the contract in The Ada, which ran for only six months and gave no similar termination option to the lessee.* Yet two experienced admiralty judges,

---

of the sea—would seem to be met by contracts for the sale of a ship. Even the more restrictive statement of the test—whether the contract concerns transportation by sea, or is one of navigation and commerce within navigable waters—is met by the lease provisions of the typical lease-purchase contract, including the contracts involved in this case.

6. People's Ferry Co. v. Beers, 1857, 20 How. 393, 15 L.Ed. 961 held that shipbuilding contracts are not within ad-

miralty jurisdiction. But the Court emphasized that the contract was "made on land, to be performed on land".

7. This note is an important commentary on the origin of the ship-sale rule and its history in the courts. The note was relied on heavily in Flota Maritima Browning v. The Ciudad De La Habana both in the district court, D.C.Md.1960, 181 F.Supp. 301, and in the Court of Appeals, 4 Cir. 1966, 363 F.2d 733. We too rely heavily on it.

Judge Smith and Judge Hand, held in that case that the charter provisions of the lease-purchase contract were within the admiralty jurisdiction, although they were reversed by the Second Circuit, for different reasons stated by the several judges. * * * "

(Emphasis added.)

181 F.Supp. at 309–310. Judge Thomsen observed with regard to *The Ada:*

The cause of action for breach of the charter provisions came on [in the district court] before Judge Learned Hand, sitting in admiralty. Judge Hand found that the owner had wrongfully withdrawn the vessel and was *liable to the charterer for the loss sustained by it as charterer,* although the damages for breach of the sale provisions were not recoverable in admiralty. 239 F. 363 at page 372, 250 F. 194 at page 195. The Court of Appeals reversed, on the ground that the District Court lacked jurisdiction. Each of the appellate judges filed an opinion. Without the citation of any authority whatever, they agreed that a contract for the sale of a ship is not a maritime contract; they seemed to agree, each for different reasons, that the *charter provisions and the sale provisions were inseparable,* and that the contract should be treated as a contract of sale. (Emphasis added.)

181 F.Supp. at page 308.

When *The Ciudad De La Habana* reached the Court of Appeals for the Fourth Circuit that Court agreed with Judge Thomsen "largely for the reasons expressed by him in a thoughtful opinion". Flota Maritima Browning de Cuba, Sociadad Anonima v. Snobl, 1966, 363 F.2d 733, 736. In a careful analysis of *The Ada,* Chief Judge Haynsworth went beyond the district court's opinion, however, and added:

From the three separate opinions filed by the court [in The Ada], however, it is apparent that each judge considered the agreement primarily one for the sale of the vessel. The *lease agree-*

*ment there was limited to a period of six months. * * * At the time of the breach of the contract, the charterer [in The Ada] had in fact exercised his option to purchase, thereby converting the agreement into a contract of sale.*

*Under other lease-purchase agreements, however, claims may arise which are clearly founded upon the lease provisions and which would be within admiralty jurisdiction.* The primary opinion in The Ada clearly recognized this possibility.

In this case the agreements were to extend for *periods of seven and fifteen years.* The economic compulsion to exercise the purchase option is clearly not so great where the cost of use for a long period approximates purchase price as it is where the cost of use for six months is the same as the purchase price. Nor is there an indication that the rentals here were so unreasonably high as to suggest a disguised sale. *Although the contract could have been converted into a sale at the option of either party, up to the time of its termination it had not been.* Unlike the contract in The Ada, at the time the libel was filed, the parties had operated only under the lease provisions and *the purchase-sale options were unexercised. The character of the contract was thus fixed, as between the parties, as a charter.* (Emphasis added.)

363 F.2d 733, at 736. The italicized words in this opinion show that the case under review by this Court falls within the principles expressed in *The Ciudad De La Habana* rather than within a wooden application of the supposed *Ada* rule.

Aside from *The Ciudad De La Habana,* which distinguished *The Ada,* there is very little direct authority. Grand Banks Fishing Co. v. Styron (The Caracara), S.D.Me.1953, 114 F.Supp. 1, followed *The Ada,* but in that case the plaintiff had purchased a fishing vessel then at sea and had paid the full purchase price.

Upon the boat's arrival, the plaintiff discovered major defects and brought a libel for breach of warranty in a federal district court. There was no charter party involved. Even so, Judge Thomsen, discussing *The Caracara in Ciudad De La Habana*, pointed out: "Since it is agreed that admiralty has jurisdiction of contracts for repair of a vessel, and repairs often give rise to a maritime lien, the decision in *The Caracara* seems particularly anomalous". 181 F.Supp. at 308, n. 10.

In Texas and New Orleans Barge Line, Inc. v. Tug Patsy H, E.D.La.1968, 279 F. Supp. 697 the district court had before it a lease-purchase contract in the form of a charter party that was similar to the contracts sued on in the case before this Court. The libellant, (Jack Nielson) as the owner of the Tug Patsy H entered into a bareboat charter party with Nagel Towing Co. to lease the vessel *for forty-eight months*. The charter contained a provision allowing Nagel Towing Co. to purchase the tug at a stipulated price at the termination of the charter period. The respondents argued that because of this provision the contract was "not a charter agreement at all but rather amounted to a sale of the tug" governed by Louisiana law; that under Louisiana law it would be against public policy to allow the libellant to recover for rentals owed at the time the vessel was surrendered to the owner. The defendants make the same argument here. Chief Judge West gave this argument short shrift: "The Court finds no merit to these contentions. In a charter party the parties may contract as they choose, J. B. Effenson Co. v. Three Bays Corp., 5 Cir. 1956, 238 F.2d 611, and they are of course, bound by the contract as written. * * * This charter party was a bareboat rental of the Tug Patsy H for a specified time at a specified price and nothing else. It was not a sale". 279 F.Supp. at 698.

*Effenson*, cited by Judge West, was a civil action upon a charter party. The court held that rights under the charter party were covered by maritime law and not the common law or statutory law of a state. To allow a plaintiff to elect a state forum would defeat the uniformity the Constitution requires in maritime law. The case is not without bearing here. The constitutional objective of uniformity and the intentions of the parties would surely be defeated if the Neilson-Apache charter parties were subject to the Louisiana Deficiency Judge Act, LRS 13–4106, or to Louisiana public policies and decisions governing land-based conventional obligations, entertain a bill or libel for specific performance * *. The jurisdiction embraces all maritime contracts, torts; injuries or offenses and *it depends upon the nature of the contract*, and is limited to contracts, claims, claims and services *purely maritime* and touching rights and duties appertaining to commerce and navigation". (Emphasis added.) Rea v. The Eclipse, 1890, 135 U.S. 599, 608, 10 S.Ct. 873, 34 L.Ed. 269. But, as pointed out in *The Ciudad De La Habana*, "While the principle is one of general validity when the non-maritime elements are substantial and inseparable from the maritime elements, it has long been recognized that where the maritime elements of a contract are susceptible to separate adjudication admiralty jurisdiction may be exercised to that extent." 363 F.2d at 735. The Fourth Circuit cited Compagnie Francaise de Navigation a Vapeur v. Bonnasse, 2 Cir. 1927, 19 F.2d 777; Eastern Massachusetts Street Ry. Co. v. Transmarine Corp., 1 Cir. 1930, 42 F.2d 58; Berwind-White Coal Mining Co. v. City of New York, 2 Cir. 1943, 135 F.2d 443.

Despite the plaintiff's false start in his original petition, it is now evident that the subject matter of the dispute is a bareboat charter. (1) During the term of the charter the charterer did have an option to purchase, but it was not exercised. (2) In the event of default in the monthly payments, the charterer had an option to purchase within thirty days of notice of default. But the charterer made it plain that he could not pay the

monthly rentals, much less buy the vessels. (3) The charterer agreed "at the termination of the sixty-months period" to purchase each vessel for half of the agreed valuation (identical with the stipulated purchase price option). But the parties never reached the termination of the sixty-months period. The operable provisions of the contract therefore relate only to the bareboat charter. And the contract provided:

> No cancellation or other termination of this agreement by either party shall in any way relieve Charterer of liability for the payment of any sum or sums due or to become due Owner under this agreement, or any damages which Owner shall have sustained, whether by omission or commission.

Unlike *The Ada,* here the charterer made no offer to purchase the vessels; the charter was for a long term; the total monthly payments were considerably less than the stipulated price; as indicated by the testimony of the charterer's president, the parties regarded the contract primarily as a bareboat charter, not as a contract to purchase. Well they should in view of the vessels' exposure for five years to the hazards of the sea.

We question the validity of a broad and mechanical formulation of *The Ada* rule that treats as non-maritime all charter parties to which is added an option or agreement to purchase. We prefer to follow the *Ciudad De La Habana.* In any event, on the facts before us the case under review is distinguishable from *The Ada.* We hold that the contracts here were primarily charter parties; that the provisions relating to the bareboat charter were maritime in nature and severable from the unexecuted options and the charter's agreement to purchase on the termination of the charter.

We express no opinion as to how much of the total charter hire, if any the plaintiff is entitled now to recover.

The district court's order denying the defendants' motion to dismiss the complaint is affirmed.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is DENIED and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.